**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION; IDAHO WILDLIFE FEDERATION; WASHINGTON WILDLIFE FEDERATION; SIERRA CLUB; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC.; INSTITUTE FOR FISHERIES RESOURCES; IDAHO RIVERS UNITED; IDAHO STEELHEAD AND SALMON UNITED; NORTHWEST SPORT FISHING INDUSTRY ASSOCIATION; SALMON FOR ALL; COLUMBIA RIVERKEEPER; NW ENERGY COALITION; FEDERATION OF FLY FISHERS; AMERICAN RIVERS, INC., | No.   17-35462  D.C. No. 3:01-cv-00640-SI  OPINION |

Plaintiffs-Appellees,

STATE OF OREGON,

Intervenor-Plaintiff-
Appellee,

 v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

Defendants-Appellants,

and

STATE OF WASHINGTON; STATE OF MONTANA; STATE OF IDAHO; KOOTENAI TRIBE OF IDAHO; CONFEDERATED SALISH AND KOOTENAI TRIBES; INLAND PORTS AND NAVIGATION GROUP; NORTHWEST RIVER PARTNERS; NORTHWEST IRRIGATION UTILITIES; PUBLIC POWER COUNCIL; COLUMBIA-SNAKE RIVER IRRIGATORS ASSOCIATION,

Intervenor-Defendants.

NATIONAL WILDLIFE FEDERATION; IDAHO WILDLIFE FEDERATION; WASHINGTON WILDLIFE FEDERATION; SIERRA CLUB; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC.; INSTITUTE FOR FISHERIES RESOURCES; IDAHO RIVERS UNITED; IDAHO STEELHEAD AND SALMON UNITED; NORTHWEST SPORT FISHING INDUSTRY ASSOCIATION; SALMON FOR ALL; COLUMBIA RIVERKEEPER; NW ENERGY COALITION; FEDERATION OF FLY FISHERS; AMERICAN RIVERS, INC.,

Plaintiffs-Appellees,

No.    17-35463

D.C. No. 3:01-cv-00640-SI

2

STATE OF OREGON,

        Intervenor-Plaintiff-
        Appellee,

 v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

        Defendants,

STATE OF WASHINGTON; STATE OF
MONTANA; STATE OF IDAHO;
KOOTENAI TRIBE OF IDAHO;
CONFEDERATED SALISH AND
KOOTENAI TRIBES; INLAND PORTS
AND NAVIGATION GROUP;
NORTHWEST IRRIGATION
UTILITIES; PUBLIC POWER
COUNCIL; COLUMBIA-SNAKE RIVER
IRRIGATORS ASSOCIATION,

        Intervenor-Defendants,

 and

NORTHWEST RIVER PARTNERS,

        Intervenor-Defendant-
        Appellant.

NATIONAL WILDLIFE FEDERATION;
IDAHO WILDLIFE FEDERATION;
WASHINGTON WILDLIFE
FEDERATION; SIERRA CLUB;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, INC.;
INSTITUTE FOR FISHERIES
RESOURCES; IDAHO RIVERS
UNITED; IDAHO STEELHEAD AND
SALMON UNITED; NORTHWEST
SPORT FISHING INDUSTRY
ASSOCIATION; SALMON FOR ALL;
COLUMBIA RIVERKEEPER; NW
ENERGY COALITION; FEDERATION
OF FLY FISHERS; AMERICAN
RIVERS, INC.,

   Plaintiffs-Appellees,

STATE OF OREGON,

   Intervenor-Plaintiff-
   Appellee,

 v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

   Defendants,

STATE OF WASHINGTON; STATE OF
MONTANA; KOOTENAI TRIBE OF
IDAHO; CONFEDERATED SALISH
AND KOOTENAI TRIBES; INLAND

No. 17-35465

D.C. No. 3:01-cv-00640-SI

4

PORTS AND NAVIGATION GROUP;
NORTHWEST RIVER PARTNERS;
NORTHWEST IRRIGATION
UTILITIES; PUBLIC POWER
COUNCIL; COLUMBIA-SNAKE RIVER
IRRIGATORS ASSOCIATION,

Intervenor-Defendants,

and

STATE OF IDAHO,

Intervenor-Defendant-
Appellant.

NATIONAL WILDLIFE FEDERATION;
IDAHO WILDLIFE FEDERATION;
WASHINGTON WILDLIFE
FEDERATION; SIERRA CLUB;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, INC.;
INSTITUTE FOR FISHERIES
RESOURCES; IDAHO RIVERS
UNITED; IDAHO STEELHEAD AND
SALMON UNITED; NORTHWEST
SPORT FISHING INDUSTRY
ASSOCIATION; SALMON FOR ALL;
COLUMBIA RIVERKEEPER; NW
ENERGY COALITION; FEDERATION
OF FLY FISHERS; AMERICAN
RIVERS, INC.,

Plaintiffs-Appellees,

No.    17-35466

D.C. No. 3:01-cv-00640-SI

5

STATE OF OREGON,

        Intervenor-Plaintiff-
        Appellee,

 v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

        Defendants,

STATE OF WASHINGTON; STATE OF
MONTANA; STATE OF IDAHO;
KOOTENAI TRIBE OF IDAHO;
CONFEDERATED SALISH AND
KOOTENAI TRIBES; NORTHWEST
RIVER PARTNERS; NORTHWEST
IRRIGATION UTILITIES; PUBLIC
POWER COUNCIL; COLUMBIA-
SNAKE RIVER IRRIGATORS
ASSOCIATION,

        Intervenor-Defendants,

 and

INLAND PORTS AND NAVIGATION
GROUP,

        Intervenor-Defendant-
        Appellant.

NATIONAL WILDLIFE FEDERATION; IDAHO WILDLIFE FEDERATION; WASHINGTON WILDLIFE FEDERATION; SIERRA CLUB; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC.; INSTITUTE FOR FISHERIES RESOURCES; IDAHO RIVERS UNITED; IDAHO STEELHEAD AND SALMON UNITED; NORTHWEST SPORT FISHING INDUSTRY ASSOCIATION; SALMON FOR ALL; COLUMBIA RIVERKEEPER; NW ENERGY COALITION; FEDERATION OF FLY FISHERS; AMERICAN RIVERS, INC.,

       Plaintiffs-Appellees,

STATE OF OREGON,

       Intervenor-Plaintiff-Appellee,

 v.

NATIONAL MARINE FISHERIES SERVICE; U.S. ARMY CORP OF ENGINEERS; UNITED STATES BUREAU OF RECLAMATION,

       Defendants,

STATE OF WASHINGTON; STATE OF IDAHO; KOOTENAI TRIBE OF IDAHO; CONFEDERATED SALISH AND KOOTENAI TRIBES; INLAND PORTS

No.   17-35467

D.C. No. 3:01-cv-00640-SI

7

AND NAVIGATION GROUP;
NORTHWEST RIVER PARTNERS;
NORTHWEST IRRIGATION
UTILITIES; PUBLIC POWER
COUNCIL; COLUMBIA-SNAKE RIVER
IRRIGATORS ASSOCIATION,

Intervenor-Defendants,

and

STATE OF MONTANA,

Intervenor-Defendant-
Appellant.

---

NATIONAL WILDLIFE FEDERATION;
IDAHO WILDLIFE FEDERATION;
WASHINGTON WILDLIFE
FEDERATION; SIERRA CLUB;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, INC.;
INSTITUTE FOR FISHERIES
RESOURCES; IDAHO RIVERS
UNITED; IDAHO STEELHEAD AND
SALMON UNITED; NORTHWEST
SPORT FISHING INDUSTRY
ASSOCIATION; SALMON FOR ALL;
COLUMBIA RIVERKEEPER; NW
ENERGY COALITION; FEDERATION
OF FLY FISHERS; AMERICAN
RIVERS, INC.,

Plaintiffs-Appellees,

No.   17-35502

D.C. No. 3:01-cv-00640-SI

8

STATE OF OREGON,

        Intervenor-Plaintiff-
        Appellee,

 v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

        Defendants,

STATE OF WASHINGTON; STATE OF
MONTANA; STATE OF IDAHO;
INLAND PORTS AND NAVIGATION
GROUP; NORTHWEST RIVER
PARTNERS; NORTHWEST
IRRIGATION UTILITIES; PUBLIC
POWER COUNCIL; COLUMBIA-
SNAKE RIVER IRRIGATORS
ASSOCIATION,

        Intervenor-Defendants,

 and

KOOTENAI TRIBE OF IDAHO;
CONFEDERATED SALISH AND
KOOTENAI TRIBES,

        Intervenor-Defendants-
        Appellants.

NATIONAL WILDLIFE FEDERATION;
IDAHO WILDLIFE FEDERATION;
WASHINGTON WILDLIFE
FEDERATION; SIERRA CLUB;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, INC.;
INSTITUTE FOR FISHERIES
RESOURCES; IDAHO RIVERS
UNITED; IDAHO STEELHEAD AND
SALMON UNITED; NORTHWEST
SPORT FISHING INDUSTRY
ASSOCIATION; SALMON FOR ALL;
COLUMBIA RIVERKEEPER; NW
ENERGY COALITION; FEDERATION
OF FLY FISHERS; AMERICAN
RIVERS, INC.,

       Plaintiffs-Appellees,

STATE OF OREGON,

       Intervenor-Plaintiff-
       Appellee,

 v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

       Defendants-Appellants,

 and

STATE OF WASHINGTON; STATE OF
MONTANA; STATE OF IDAHO;

No.  18-35111

D.C. No. 3:01-cv-00640-SI

INLAND PORTS AND NAVIGATION GROUP; NORTHWEST RIVER PARTNERS; NORTHWEST IRRIGATION UTILITIES; PUBLIC POWER COUNCIL; COLUMBIA-SNAKE RIVER IRRIGATORS ASSOCIATION; KOOTENAI TRIBE OF IDAHO; CONFEDERATED SALISH AND KOOTENAI TRIBES,

Intervenor-Defendants.

NATIONAL WILDLIFE FEDERATION; IDAHO WILDLIFE FEDERATION; WASHINGTON WILDLIFE FEDERATION; SIERRA CLUB; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INC.; INSTITUTE FOR FISHERIES RESOURCES; IDAHO RIVERS UNITED; IDAHO STEELHEAD AND SALMON UNITED; NORTHWEST SPORT FISHING INDUSTRY ASSOCIATION; SALMON FOR ALL; COLUMBIA RIVERKEEPER; NW ENERGY COALITION; FEDERATION OF FLY FISHERS; AMERICAN RIVERS, INC.,

Plaintiffs-Appellees,

STATE OF OREGON,

Intervenor-Plaintiff-Appellee,

No.    18-35152

D.C. No. 3:01-cv-00640-SI

11

v.

NATIONAL MARINE FISHERIES
SERVICE; U.S. ARMY CORP OF
ENGINEERS; UNITED STATES
BUREAU OF RECLAMATION,

Defendants,

STATE OF WASHINGTON; STATE OF
MONTANA; STATE OF IDAHO;
INLAND PORTS AND NAVIGATION
GROUP; NORTHWEST IRRIGATION
UTILITIES; PUBLIC POWER
COUNCIL; COLUMBIA-SNAKE RIVER
IRRIGATORS ASSOCIATION;
KOOTENAI TRIBE OF IDAHO;
CONFEDERATED SALISH AND
KOOTENAI TRIBES,

Intervenor-Defendants,

and

NORTHWEST RIVER PARTNERS,

Intervenor-Defendant-
Appellant.

Appeals from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted March 20, 2018
San Francisco, California

12

BEFORE: THOMAS, Chief Judge, and TASHIMA and PAEZ, Circuit Judges.

Opinion by Chief Judge Sidney R. Thomas

THOMAS, Chief Judge:

These consolidated appeals are the latest round of a long-running dispute over salmon and steelhead species listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. Three federal agencies (collectively, "federal defendants"), joined by intervenor-defendants, challenge injunctions issued by the district court to protect the listed species. At the request of the National Wildlife Federation and the State of Oregon (collectively, "plaintiffs"), the district court ordered the agencies to conduct certain spill operations and fish monitoring operations at dams and related facilities in the Federal Columbia River Power System ("FCRPS"). The district court also directed the agencies to disclose to plaintiffs information on planned projects at certain dams in order to ensure that major expenditures do not bias the preparation of an environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. We affirm the district court's grant of the spill and fish monitoring injunctions, and we dismiss the appeal of the NEPA disclosure order.

## I

The Columbia River is the fourth largest river on the North American continent. It flows for more than 1,200 miles from the Canadian Rockies to the Pacific Ocean, and it drains an area of approximately 258,000 square miles, including territory in seven states and one Canadian province. The Snake River is the largest tributary of the Columbia River. It flows for more than 1,000 miles from Yellowstone National Park until it meets the Columbia River in Washington, and it drains an area of approximately 108,000 square miles, including territory in six states.

Every year, salmon and steelhead (collectively, "salmonids") travel up and down the Columbia and Snake Rivers, hatching in fresh water, migrating downstream to the Pacific Ocean on their way to adulthood, and later returning upstream to spawn and die. The wild salmonid population has decreased significantly in recent years. Today, there are thirteen species or populations of Columbia River or Snake River salmonids that are listed as either endangered or threatened under the ESA.

When these fish migrate downstream to the Pacific Ocean, they face danger from dams in the FCRPS. The dams contain turbines that produce power from the flow of water. As the fish pass through the dams on their journey to the ocean, a

14

high number die from swimming through the turbines. In light of this danger, each dam in the migration corridor of the mainstem Columbia and Snake Rivers has a bypass system to allow fish to avoid the turbines. At some dams, the bypass systems consist of screens in front of the turbine intakes that divert the fish into passageways through the dams and downstream. At others, the bypass systems divert the fish into barges for transportation around the dams.

The FCRPS includes eight multipurpose dams, reservoirs, and related facilities on the mainstem Columbia and Snake Rivers in Montana, Washington, Idaho, and Oregon. Three federal agencies coordinate to manage FCRPS dams: the U.S. Army Corps of Engineers (the "Corps"), the U.S. Bureau of Reclamation ("Reclamation"), and the Bonneville Power Administration ("Bonneville"). The Corps operates the eight mainstem dams, Reclamation operates other FCRPS dams, and Bonneville markets and transmits power generated from the hydroelectric projects. States also play a role in dam management through the governance of water diversions from the rivers and through state conservation programs. A number of federally-recognized Indian Tribes retain treaty fishing rights in the waters of the Columbia and Snake Rivers.

This litigation, which has been ongoing since 2001, primarily concerns application of the ESA to the management of the FCRPS. Section 7 of the ESA

15

requires federal agencies, in consultation with what is known as the "consulting agency," to conserve species listed under the ESA. Section 7(a)(2) of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a listed species' designated critical habitat. 16 U.S.C. § 1536(a)(2). Section 7 and its implementing regulations delineate the consultation process for determining the biological impacts of a proposed action. 16 U.S.C. § 1536(a)-(c); 50 C.F.R. § 402. In brief, if a proposed federal action may jeopardize listed species or adversely modify critical habitat, the "acting agency" must consult with the "consulting agency." 50 C.F.R. §§ 402.13, 402.14. Here, the acting agencies are the Corps and Reclamation, and the consulting agency is the National Marine Fisheries Service ("NMFS").

The consulting agency prepares a biological opinion ("BiOp") setting forth its conclusions about whether the proposed action will affect a listed species or its designated critical habitat. 16 U.S.C. § 1536(b)(3)(A). An action jeopardizes a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50

16

C.F.R. § 402.02. If the proposed action is likely to jeopardize a listed species' existence or adversely modify its critical habitat, the BiOp must set forth a reasonable and prudent alternative to the action (the "Alternative") that is not likely to jeopardize the species or adversely modify its habitat, if possible. 16 U.S.C. § 1536(b)(3)(A).

If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that the Alternative avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an "Incidental Take Statement." If followed, the Incidental Take Statement exempts the action agency from the prohibition on takings found in section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

The instant litigation also involves application of NEPA to the management of the FCRPS. NEPA requires that federal agencies complete an EIS in connection with "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

In addition to evaluating the proposed agency action, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to that action. 40 C.F.R. § 1502.14(a). "NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011).

NMFS issued a BiOp in 2000 which concluded that operation of the FCRPS dams jeopardized listed species but that a proposed Alternative would avoid jeopardy. The National Wildlife Federation ("NWF") challenged the 2000 BiOp, initiating this litigation. The district court ruled that the BiOp was arbitrary and capricious and remanded to NMFS to issue a new BiOp. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF I*"), 254 F. Supp. 2d 1196 (D. Or. 2003).

NMFS issued a new BiOp in 2004, which concluded that operation of the FCRPS dams would not jeopardize listed species. NWF filed a second supplemental complaint challenging the 2004 BiOp, and it moved for a preliminary injunction. The district court granted the preliminary injunction. The injunction required the acting agencies to increase the amount of water that passed through spillgates on certain FCRPS dams during the summer of 2005, rather than passing the water through turbines for power generation. The increased spill was intended

18

to decrease the mortality rate of fish passing through the dams. On appeal, we held that the district court had not abused its discretion in granting the injunction, but we remanded to the district court to determine whether the injunction should be more narrowly tailored. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF II*"), 422 F.3d 782 (9th Cir. 2005). The district court eventually rejected the 2004 BiOp and remanded to NMFS to issue a new BiOp. We affirmed the district court's rejection of the 2004 BiOp. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF III*"), 524 F.3d 917 (9th Cir. 2008).

NMFS issued a new BiOp in 2008. As a result of additional administrative review, NMFS issued a supplemental BiOp in 2010. Those BiOps again concluded that operation of the FCRPS dams jeopardized listed species, but that a proposed Alternative would avoid jeopardy. In 2011, the district court rejected the 2008/2010 BiOp. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF IV*"), 839 F. Supp. 2d 1117 (D. Or. 2011). The district court ordered NMFS to issue a new BiOp by 2014. In the interim, the court ordered the acting agencies to implement the 2008/2010 BiOp's Alternative and ordered increased spill to mitigate irreparable harm from dam operations.

NMFS issued its latest BiOp in 2014. The 2014 BiOp was a supplement to the 2008 BiOp. The 2014 BiOp again concluded that operation of the FCRPS

dams would jeopardize listed species and adversely modify critical habitat. It again proposed an Alternative, consisting of a suite of 74 actions that cover a ten-year period (from 2008 to 2018). The Alternative included modifications to system operations and structures at the dams to improve fish passage and migration conditions; actions to reduce salmonid predation; actions to restore salmonid habitat; hatchery management; and research, monitoring, and evaluation of salmonids. The Alternative includes some spill in order to enhance the survival of migrating juvenile salmonids. The 2014 BiOp concluded that the Alternative would avoid jeopardy and adverse modification of critical habitat.

Plaintiffs NWF and the State of Oregon filed supplemental complaints challenging the 2014 BiOp for violations of the ESA and arguing that the Corps and Reclamation had violated NEPA. In May 2016, the district court granted partial summary judgment to plaintiffs. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF V*"), 184 F. Supp. 3d 861 (D. Or. 2016). The district court concluded that NMFS violated the ESA and the Administrative Procedure Act ("APA") in determining in the 2014 BiOp that the Alternative did not jeopardize listed species. It also concluded that the Corps and Reclamation violated NEPA by not preparing a proper EIS under NEPA.

However, the court concluded that NMFS did not violate the ESA or APA in determining that the Alternative does not adversely modify critical habitat and will not adversely affect Southern Resident Killer Whales. The court remanded to NMFS to issue a new BiOp by March 1, 2018. It stated that it retained jurisdiction over the litigation to ensure that the agencies develop mitigation measures to avoid jeopardy, issue a compliant BiOp, and prepare a compliant EIS. Federal defendants and intervenor-defendants initially appealed this order, but they have since dismissed those appeals.

In July 2016, the district court entered a new remand order (the "July 2016 order"). That order approved a proposed five-year schedule for preparation of a proper EIS under NEPA. The order also extended the deadline for issuing a new BiOp to December 31, 2018. Finally, the order directed federal defendants to keep the 2014 BiOp in place and to continue to implement its Alternative until the new BiOp is issued.

In January 2017, plaintiffs filed motions requesting injunctive relief for the ESA violations identified by the district court in *NWF V*. First, plaintiffs sought an injunction ordering the Corps to increase spill to the maximum level that meets, but does not exceed, existing total dissolved gas criteria allowed under state law (the "gas cap") from April to June at the eight mainstem FCRPS dams. The requested

21

spill would commence in April 2017 and continue for the remainder of the BiOp remand period. The proposed injunction contained off-ramps to allow the Corps to reduce spill for reasons such as power emergencies, health and safety, or other issues.

Oregon also sought an injunction ordering federal defendants to operate juvenile bypass facilities and associated Passive Integrated Transponder ("PIT") tag detection systems at FCRPS dams beginning in March 2017. NWF sought an injunction under NEPA that would prohibit the Corps from making significant capital expenditures at certain FCRPS dams during the NEPA remand period absent court approval. Such expenditures, NWF argued, would bias the ongoing EIS process.

In April 2017, the district court entered an amended order granting in part and denying in part plaintiffs' injunction motions (the "April 2017 order"). The district court first considered whether plaintiffs' motions were barred by Federal Rule of Procedure 60(b). The court held that, even if Rule 60(b) applied to plaintiffs' motions, it could grant the requested relief under Rule 60(b)(6).

The district court granted the motions for injunctive relief under the ESA. The court held that there is no presumption of irreparable injury where there has been an ESA violation, but that the court was stripped of discretion to weigh other

22

traditional equitable factors. The district court held that plaintiffs did not need to show that operating without the requested court-ordered spill during the two-year remand period would pose an imminent threat at the species level, nor that the Alternative's spill-related operations specifically are causing irreparable harm. Considering the evidence in the record—including findings from previous opinions and orders issued as part of this litigation—the court found irreparable harm sufficient to order increased spring spill. The court decided that implementing increased spill in spring 2017 was too rushed, and it delayed the new spill operations until April 3, 2018. It ordered the federal defendants, in collaboration with the parties and regional experts, to produce a spill plan and proposed injunction order.

The district court also granted plaintiffs' PIT tag monitoring injunction, but it delayed implementation until March 1, 2018. Finally, the district court considered plaintiffs' NEPA capital expenditure injunction request. The court found that significant expenditures on FCRPS dams during the NEPA remand period were likely to cause irreparable harm by creating a substantial risk of bias in the NEPA process. The district court nevertheless denied plaintiffs' injunction motion, because it found that the balance of hardships and considerations of public interest favored allowing some expenditures. However, the court directed the

Corps and Reclamation to disclose information to plaintiffs regarding planned expenditures at FCRPS dams. With this information, plaintiffs could file motions to enjoin projects that were not necessary for dam safety and that could substantially bias the NEPA process.

Federal defendants and three intervenor-defendants timely appealed. We consolidated these appeals.

II

Federal Rule of Civil Procedure 60(b) did not bar plaintiffs' January 2017 injunction motions, as federal defendants and intervenor-defendants contend. Defendants argue that *NWF V* was a final judgment, and thus plaintiffs' January 2017 motions for injunctive relief were subject to Rule 60(b). Defendants further contend that Rule 60(b)(6)—which the district court relied on in its April 2017 order—does not permit the motion. However, the May 2016 summary judgment and remand order was not a final judgment, and thus Rule 60(b) did not apply to the January 2017 injunction motion.

Rule 60(b) provides grounds for relief "from a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). The word "final" in the Rule designates orders that terminate litigation and are subject to appeal. *Corn v. Guam Coral Co.*, 318 F.2d 622, 628-29 (9th Cir. 1963). The final judgment rule is to be "given a

practical rather than a technical construction." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1175 (9th Cir. 2011) (internal quotation marks omitted).

Giving the finality rule a practical construction, the May 2016 order was not final. In that order, the district court expressly stated that it "retains jurisdiction over this matter" to ensure that federal defendants develop appropriate mitigation measures to avoid jeopardy, issue a new BiOp that complies with the ESA and APA, and prepare an EIS that complies with NEPA. *NWF V*, 184 F. Supp. 3d at 950. Moreover, federal defendants appear to have acknowledged that the May 2016 order did not preclude plaintiffs from moving for later injunctive relief. In July 2016, before the district court issued its NEPA remand order, federal defendants submitted a reply brief to the court in which they stated that plaintiffs "are free to move the Court for [injunctive] relief if at some future point they deem it necessary." In light of the district court's retention of jurisdiction, the May 2016 order was not a final judgment, and Rule 60(b) did not apply to plaintiffs' January 2017 motions for injunctive relief.

This conclusion is consistent with our past rulings on the finality of remand orders. A remand order is ordinarily final only for purposes of a *government* appeal under 28 U.S.C. § 1291. *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1229 (9th Cir. 2014). A remand order may be final for purpose of a

plaintiff's appeal in cases "when the broad relief sought could not be achieved through the action the district court directed the agency to undertake." *Sierra Forest Legacy*, 646 F.3d at 1175. For example, an "extremely narrow" partial remand for a "mechanical recalculation" does not preclude appellate review of a plaintiff's underlying claims, because the district court's opinion is "practically final." *Pauly v. U.S. Dep't of Agric.*, 348 F.3d 1143, 1148 (9th Cir. 2003). The May 2016 remand order was not "extremely narrow" or merely for a "mechanical recalculation." It granted plaintiffs most of the relief they sought. The rare circumstances in which an order remanding to an agency can be final for purposes of a plaintiff's appeal do not apply here. Thus, the May 2016 order was not a final judgment, Rule 60(b) did not apply to subsequent injunction motions, and the district court did not err in considering plaintiffs' January 2017 motions.

## III

The district court did not abuse its discretion in granting the spring spill injunction. Federal defendants and intervenor-defendants argue that the framework the district court used in analyzing the request for injunctive relief was incorrect as a matter of law and that the district court's findings of fact were clearly erroneous. Intervenor-defendant Northwest RiverPartners also argues that, even if plaintiffs have established irreparable harm to listed species, they have not established

26

irreparable harm to themselves. Finally, federal defendants and intervenor-defendants argue that the district court's injunction was an abuse of discretion because it was not narrowly tailored to the irreparable harm found. After due consideration of these arguments, we conclude that the district court did not abuse its discretion in granting the spill injunction.

## A

A plaintiff seeking a permanent injunction must show:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). The district court concluded that plaintiffs here sought "interim injunctive measures," because the injunction may be lifted after federal defendants issue a new BiOp and comply with NEPA. *See S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1052 (E.D. Cal. 2011). Thus, the first prong of the injunction test should be modified to match the analogous prong in the preliminary injunction test: plaintiffs must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res.*

27

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also S. Yuba River Citizens League*, 804 F. Supp. 2d at 1052 (concluding that where a similar procedural posture existed, the court would look at "whether the measures are necessary to prevent irreparable injury").

"[T]he ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted." *Cottonwood*, 789 F.3d at 1090. The ESA removes the latter three factors in the four-factor injunctive relief test from our equitable discretion. When considering an injunction under the ESA, we presume that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction. *Id.*

The ESA does not, however, restrict our discretion to decide whether a plaintiff has suffered an irreparable injury. *Cottonwood*, 789 F.3d at 1090. "[T]here is no presumption of irreparable injury where there has been a procedural violation in ESA cases." *Id.* at 1091. Plaintiffs must demonstrate that irreparable injury "is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). A "possibility" of irreparable harm cannot support an injunction. *Id.*

28

B

The district court conducted a proper irreparable harm analysis. Federal defendants and intervenor-defendants contend that the district court erred by not focusing on extinction-level risks to the listed species during the remainder of the remand period. They contend that the district court also erred by considering harms from the operation of the FCRPS dams as a whole, rather than harms from only the spill-related components of the Alternative during the remainder of the remand period.

We review the legal conclusions underlying the grant of an injunction *de novo*. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013). We conclude that the district court did not conduct an incorrect irreparable harm analysis.

1

The district court did not err when it found irreparable harm without finding an extinction-level threat to the listed species in the remaining two years of the remand period. Irreparable harm should be determined by reference to the purposes of the statute being enforced. *See Garcia v. Google*, 786 F.3d 733, 744-45 (9th Cir. 2015) (en banc) (rejecting allegations of irreparable harm because the harm was not to legal interests meant to be protected by copyright law); *see also*

29

*Sierra Club v. Marsh*, 872 F.2d 497, 502-03 (1st Cir. 1989) (stating that the kinds of harms that may be irreparable "will be different according to each statute's structure and purpose").

One of the ESA's central purposes is to conserve species. *See* 16 U.S.C. § 1531(b) (a purpose of the ESA is to provide "a program for the conservation of . . . endangered species and threatened species"). The "plain intent" of Congress in enacting the ESA was "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); *see also* 16 U.S.C. § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"). The ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species. *See* 16 U.S.C. § 1538(a)(1)(B) (prohibiting the "take" of any animal from a listed species). Harm to those members is irreparable because "[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *FCC v. Rosboro Lumber*, 50 F.3d 781, 785 (9th Cir. 1995); *see also* *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) (concluding that habitat modification which significantly impaired breeding and sheltering of a

30

listed species amounted to "harm" under ESA, even though plaintiffs did not allege

extinction-level threat to the species).

Showing an extinction-level threat to listed species is not required before an

injunction can issue under the ESA:

> We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps. However, what we require is a definitive threat of future harm to protected species, not mere speculation.

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994).

Thus, a threat of harm to a listed species that falls below an imminent extinction

threat can justify an injunction.

That the plaintiffs in *Marbled Murrelet* and *Burlington N. R.R.* sought

injunctions under section 9 of the ESA rather than for procedural violations of

section 7(a)(2) does not render those cases inapposite. When a court assesses

whether the purposes of a statute constrain its equitable discretion, it is error to

"focus[] on the statutory procedure rather than on the underlying substantive policy

the process was designed to effect." *Amoco Prod. Co. v. Village of Gambell*, 480

U.S. 531, 544 (1987). Here, the ESA's underlying purpose is the conservation of

species, and that purpose animates both sections 7 and 9. *See Cottonwood*, 789

F.3d at 1091-92 (recognizing that the "purposes and objectives" of the ESA provide "fundamental direction to the district courts when confronted with a request for injunctive relief to remedy a procedural violation of the ESA," and the ESA's purpose is to conserve "species and the ecosystems that support them").

Moreover, the fact that section 7(a)(2) permits some incidental take of listed species does not establish that harm to individual members of a species cannot be irreparable. Section 7(a)(2) permits incidental take *only* where NMFS has determined in a valid BiOp that the activity and level of incidental take complies with the ESA. 16 U.S.C. §§ 1536(b)(4)(A)-(B). Where, as here, the BiOp violates the ESA, that condition is absent.

Thus, the district court was not required to find a short-term extinction-level threat to listed species in order to find likely irreparable harm for purposes of an ESA injunction. It was not legal error or an abuse of discretion to base the injunction on a finding of a lesser magnitude of harm.

2

The district court did not err when it found harm from the operation of the FCRPS dams as a whole, rather than harm from only the spill-related components of the Alternative during the remainder of the remand period. Irreparable harm requires a showing that the harm "is *likely* in the absence of the injunction."

32

*Winter*, 555 U.S. at 22 (emphasis added). There must be a "sufficient causal connection" between the alleged irreparable harm and the activity to be enjoined, and showing that "the requested injunction would forestall" the irreparable harm qualifies as such a connection. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011). However, a plaintiff "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012).

While the irreparable harm must be causally connected to the activity to be enjoined, we have not held that the cause of an irreparable injury must be defined as narrowly as federal defendants and intervenor-defendants suggest. Irreparable harm may be caused by activities broader than those that plaintiffs seek to enjoin. Moreover, as a practical matter, the effects on listed species of the current spill regime on listed species cannot be cleanly divorced from the effects of FCRPS dam operations taken as a whole. Listed species are exposed to the combined operations of the entire system. Finally, we note that our earlier rulings in the course of this litigation suggest that the cause of irreparable harm can be broader than merely the activity to be enjoined. When we affirmed the 2005 spill injunction, we considered the operation of the FCRPS dams as a whole and upheld

33

a finding of irreparable injury when "continuation of the status quo could result in irreparable harm to a threatened species." *NWF II*, 422 F.3d at 796.

The district court was not required to find irreparable harm solely from the current spill regime in order to find irreparable harm for purposes of an ESA injunction. It was not an abuse of discretion to base the injunction on a finding of irreparable harm from the operation of the FCRPS dams as a whole.

C

The district court did not err in finding irreparable harm sufficient to support injunctive relief. The district properly concluded that FCRPS dam operations were likely to cause irreparable harm to listed salmonids. The district court also properly concluded that plaintiffs had adequately shown harm to themselves as a result of harm to listed salmonids.

We review the factual findings underlying the grant of an injunction for clear error. *NWF II*, 422 F.3d at 794-95. A finding of fact is clearly erroneous if it is implausible in light of the record, viewed in its entirety, or if the record contains no evidence to support it. *Id.* at 794 (internal citations omitted).

1

The district court properly concluded that operation of the FCRPS dams would cause irreparable harm to listed salmonids absent an injunction. The district

court relied on the record underlying *NWF V* as well as findings contained in earlier opinions and orders. The district court described *NWF V* as finding "that despite the 73 RPAs [reasonable and prudent alternatives] from the 2008 and 2014 BiOps, the most recent data shows that the listed species remain in a 'precarious,' 'imperiled,' and 'perilous' state." The data that *NWF V* relied on in making its precarious state finding comes from Table 2.1-1 of the 2014 BiOp, which summarized a five-year status review of listed species conducted in 2011. *See NWF V*, 184 F. Supp. 3d at 879-80 (citing 2014 BiOp at pp. 70-71). Table 2.1-1 shows that, as measured by "Overall Viability Rating," 50 of the 77 (64.9 percent) evolutionary significant units of listed species are at "high risk" of extinction. This includes 27 of 28 populations of Snake River Spring/Summer Chinook and all populations of the Upper Columbia River Steelhead and Spring Chinook. Twenty-two of the 77 populations (28.5 percent) are at "maintained risk" of extinction, 3 of the 77 populations (3.8 percent) are "viable," and 2 of the 77 populations (2.5 percent) are "highly viable."

The district court also highlighted our opinion in *NWF III*, which emphasized the highly precarious status of the listed species. *See NWF III*, 524 F.3d at 933. It also cited the 2011 spill injunction order, which found "ample evidence in the record that indicates that the operation of the FCRPS causes

substantial harm to listed salmonids" and that the existence and operation of the dams accounts for most of the mortality of juveniles migrating through the FCRPS. *NWF IV*, 839 F. Supp. 2d at 1131. Thus, there is a likelihood of irreparable harm to listed salmonids from the operation of the FCRPS dams as a whole.

Federal defendants and intervenor-defendants argue that the district court's findings were not supported by the record. First, federal defendants argue that *NWF V* and the April 2017 order did not find that the 74 actions constituting the Alternative are likely to jeopardize the continued existence of listed species, because the only findings concerned *recovery* of listed species. Thus, federal defendants argue, the April 2017 injunction order did not support a finding that any listed species faced a threat of extinction in the short term.

As discussed above, the district court did not need to find an extinction-level threat to the listed species in the short term. However, even if a focus only on short-term survival were required, the district court found that the continued low abundance of the listed species made them vulnerable to extinction. The district court found in *NWF V* that NMFS had failed to analyze properly how climate change "increases the chances of an event that would be catastrophic for the survival" of listed species. *NWF V*, 184 F. Supp. 3d at 874. The district court cited documents from NMFS that acknowledged that "[i]mpeding a species' progress

36

toward recovery exposes it to additional risk and so reduces its likelihood of survival." *NWF V*, 184 F. Supp. 3d at 891 (quoting August 26, 1999 NOAA Fisheries Memorandum on Habitat Approach from Rick Applegate and Donna Darm at p. 3). The April 2017 order made clear that the sustained low abundance of the listed species made them vulnerable to extinction from shock events, and this vulnerability was confirmed by climatic conditions in 2015.

Federal defendants and intervenor-defendants also argue that there is a "mismatch" between *NWF V*'s conclusions on the Alternative and the findings of irreparable harm in the April 2017 order. According to defendants, this mismatch is evidenced by *NWF V*'s holding that NMFS's determination that the Alternative is not likely to adversely modify critical habitat was not arbitrary and capricious. *NWF V*, 184 F. Supp. 3d at 933. Federal defendants also cite the findings from NMFS's most recent five-year review of listed species, which plaintiffs have not contested, concluding that the "risk trends" for the relevant listed species are all either stable or improving. In light of these findings, federal defendants assert that the district court's finding of irreparable harm is not supported by the evidence.

However, the district court properly concluded that the listed species remain in a "precarious" state, and that they will remain in such a state without further conservation efforts beyond those included in the 2014 BiOp. Although the

district court declined to hold that NMFS's critical habitat determination was arbitrary and capricious, it nevertheless found that critical habitat, including "the migration corridors [of the Snake and Columbia Rivers] are degraded, are not functional, and do not serve their conservation role." *NWF V*, 184 F.Supp. 3d at 930. The fact that the 2014 BiOp's Alternative would lead to "significant improvements to the mainstem habitat," *NWF V*, 184 F.Supp.3d at 933, does not establish an absence of harm; it only establishes an incremental improvement. The same is true of federal defendants' argument about the five-year review allegations, which establish some improvement but do not negate a finding of continued low abundance and vulnerability.

Federal defendants also assert that the district court's finding of irreparable harm was insufficient because its use of labels like "precarious" was not grounded in evidence beyond the fact that the species remain listed. However, the district court did not rely merely on the fact that the species remain listed. It relied on earlier findings that the low abundance levels of the listed species rendered them subject to sudden shocks from, e.g., climate change; and it relied on findings that highlighted specific threats to the listed species beyond the mere fact of their low abundance. These findings were not clearly erroneous.

Intervenor-defendant Northwest RiverPartners argues that plaintiffs have shown harm to the listed species, but not to themselves. The district court rejected RiverPartners' argument, finding that plaintiffs "have adequately shown how harm to the listed species will affect" them. We agree.

Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 20 (plaintiff must establish "that he is likely to suffer irreparable harm"); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (for standing purposes, plaintiff must show "injury to the plaintiff" rather than "injury to the environment"). Here, plaintiffs have shown irreparable harm to their own interests stemming from the irreparable harm to the listed species. For example, in support of its motion for the injunction, NWF submitted a declaration from Kevin Lewis that described his recreational and aesthetic pursuits on Idaho's rivers that depend on the health of listed salmonid populations. He stated that "[t]he entire ecosystem where I boat, photograph and recreate is degraded and harmed by the greatly diminished levels or even absence of salmon and steelhead from their historic habitat." He connected his injuries to the anticipated irreparable injuries to salmonids from dam operations, stating that "[f]ewer salmon mean fewer

opportunities to see them, and because healthy salmon and steelhead populations are essential to my ability to completely enjoy the wonders of Idaho's rivers, fewer salmon directly harm my enjoyment of these activities."

This evidence is consistent with evidence we have held sufficient for irreparable harm in similar contexts. *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (upholding finding of irreparable harm where plaintiff organization asserted "that the Project will harm its members' ability to 'view, experience, and utilize' the areas in their undisturbed state"). The district court decisions that Northwest RiverPartners cites are not to the contrary, because in both cases, the plaintiffs had failed even to establish irreparable harm to the listed species. *See Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014) (stating that plaintiffs did not "provide evidence of any irreparable harm to any endangered, threatened, or proposed species or species habitat in the absence of an injunction" or even that such species were present in the affected area); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1264 (W.D. Wash. 2015) (concluding that "because Plaintiffs have failed to make a strong showing that irreparable harm to the Pacific lamprey is likely, they have also failed to establish a likelihood of irreparable harm to" themselves).

The district court's finding of irreparable harm to plaintiffs themselves was not clearly erroneous. It was not an abuse of discretion to base the injunction on this finding.

D

The district court's injunction was narrowly tailored to avoid the irreparable harm that the district court identified. We review the scope of an injunction for abuse of discretion. *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 653 (9th Cir. 2002). We review the factual findings underlying an injunction for clear error. *Id.* A trial court abuses its discretion "by fashioning an injunction which is overly broad." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). The injunction here is not overly broad.

There must be a "sufficient causal connection" between the alleged irreparable harm and the activity to be enjoined, *Perfect 10*, 653 F.3d at 982, but a plaintiff "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *M.R.*, 697 F.3d at 728. It is not an abuse of discretion for a court to issue an injunction that does not completely prevent the irreparable harm that it identifies.

The district court reviewed evidence in favor of and against additional spill, including evidence from the Comparative Survival Study ("CSS") annual reports;

41

the Independent Scientific Advisory Board's ("ISAB") February 20, 2014 review of a spill experiment proposal based on a 2013 CSS study; and Oregon's experts. The district court acknowledged that federal defendants provided expert testimony expressing "concerns regarding increased spill," but it concluded that the evidence opposing increased spill was "not as compelling as the evidence supporting additional spill," and that federal defendants' concerns could be addressed by narrowly tailoring the injunction. The court's finding that "there is sufficient scientific support for a limited injunction requiring increased spill to benefit the listed species" is not clearly erroneous.

Federal defendants argue that plaintiffs only identified vague and hypothetical survival benefits from increased spill. This is incorrect. In support of its injunction motion, Oregon presented expert declarations attesting that increased spill would improve juvenile survival and adult returns. This evidence is not of "potential" or "hypothesized" survival benefits; it includes significant evidence from decades of studies showing that spill volumes higher than those proposed in the 2014 BiOp will lead to higher survival rates for outmigrating salmonids. Federal defendants attempt to relitigate the district court's consideration of the scientific evidence for and against increased spill. At best, federal defendants

42

establish uncertainty about the benefits of increased spill, but the existence of scientific uncertainty does not render the district court's findings clearly erroneous.

That the district court described the injunctive relief as involving "some experimentation" is not to the contrary. The district court expressed similar uncertainty about whether the risks of gas-cap spill that federal defendants asserted would materialize. Some uncertainty about the efficacy of an injunction does not render the factual findings underlying the injunction clearly erroneous.

In addition to challenging the factual findings underlying the injunction, federal defendants argue that the scope of the injunction was an abuse of discretion. Specifically, federal defendants argue that the spill injunction intrudes into the traditional administrative functions of federal agencies. We disagree.

In fashioning equitable relief, a court "must act within the bounds of the statute and without intruding upon the administrative province," but it "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989) (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939)). The district court's order does not run afoul of these principles. The court ordered the parties to develop a spill operation plan and gave them a year of lead time to do so. This gave the agencies ample time to conduct short-term tests to consider the

effects of increased spill, to evaluate what problems might arise, and to make adjustments to the spill operation plan without having to worry about violating a court order. This does not constitute an "unbounded" exercise of discretion, and it does not "intrud[e] upon the administrative province." The scope of injunctive relief is well within the ambit of the district court's equitable authority. The order was not an abuse of discretion.

### III

The district court did not abuse its discretion in granting the PIT tag monitoring injunction. The PIT tag monitoring injunction is evaluated using the same modified permanent injunction standard as was used to evaluate the spill injunction. The April 2017 order applied the correct irreparable harm analysis, was not based on clearly erroneous findings of facts, and did not exceed the bounds of the district court's discretion.

Intervenor-defendants Idaho and Montana argue that the district court erred by not finding irreparable harm specifically from the absence of PIT tag monitoring in 2018. This repeats the argument discussed above, that the district court's discretion was limited to finding irreparable harm specifically from the spill-related components of the Alternative in the remainder of the remand period.

As discussed, the district court's discretion in finding irreparable harm is not so limited. The district court's analysis of irreparable harm was not legally erroneous.

Federal defendants and intervenor-defendants also argue that this injunction was not based on findings in the record. However, the district court cited expert testimony stating that "early monitoring will provide a biological benefit by providing an alternative to turbine passage for outmigrating fish during the pre-spill period and that the early and late tails of a run are particularly important for species diversity." The district court also cited Washington's expert, who supported early PIT tag monitoring and stated in a declaration that "[t]here is strong scientific evidence that the tails of salmon and steelhead runs contain a disproportionate amount of the population traits that support adaptation to environmental changes, such as the conditions witnessed in 2015." The court noted that the defendants "question the volume of fish that may be migrating early," but it apparently did not find this evidence more persuasive than the evidence presented by the plaintiffs. The district court's findings were not clearly erroneous.

The remainder of the arguments asserted against the PIT tag monitoring injunction repeat arguments discussed above, that the district court exceeded the bounds of its discretion by not deferring to the agencies' judgment as to how to

45

manage the dams. For the same reasons that the spill injunction was not an abuse of discretion, the PIT tag monitoring injunction was also not an abuse of discretion.

IV

The district court's NEPA disclosure order is not properly before us. We have jurisdiction over interlocutory orders from the district courts "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). Because the district court's order neither granted an injunction nor modified an injunction, it is not appealable under § 1292(a)(1).

"An order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988). Orders relating to discovery, for example, are orders that regulate the conduct of litigation and are not appealable under § 1292(a)(1). *Gon v. First State Ins. Co.*, 871 F.2d 863, 865-66 (9th Cir. 1989). Here, the district court ordered the Corps and Reclamation "to disclose sufficient information to Plaintiffs regarding the planned projects at each dam during the NEPA remand period, at appropriate and regular intervals." The court noted that plaintiffs could "file a new motion with the Court to enjoin" a planned project if

46

they believed that it was not needed for safe operations of the dams and would substantially bias the NEPA process. Rather than granting "some or all of the substantive relief sought by a complaint," which could qualify as an injunction, the disclosure order thus "concern[s] the conduct of the parties or their counsel" in litigation. *In re Lorillard Tobacco Co.*, 370 F.3d 982, 986-87 (9th Cir. 2004) (quoting *Int'l Prods. Corp. v. Koons*, 325 F.2d 403, 406-07 (2d Cir. 1963)). It is akin to a discovery order rather than an injunction, and it is not appealable under § 1292(a)(1).

Nor did the disclosure order modify the existing NEPA injunction, which requires the Corps and Reclamation to prepare a compliant EIS within five years. The disclosure order did not substantially change the terms of the NEPA injunction, nor did it alter the legal relationship between plaintiffs and the agencies. The order only required periodic disclosures with the court so that plaintiffs would have the option of seeking later injunctive relief if necessary. This does not constitute a modification of the existing injunction. *See Cunningham v. David Special Commitment Ctr.*, 158 F.3d 1035, 1037 (9th Cir. 1998) (holding that an order modifies an injunction for purposes of § 1292(a)(1) only if it "substantially alters the legal relations of the parties"); *cf. Gon*, 871 F.2d at 866 (holding that an order modified an existing injunction because it "substantially changed the terms

and force of the injunction"). The district court's disclosure order is thus not appealable under § 1292(a)(1) and is not properly before us. If plaintiffs later seek to enjoin expenditures on FCRPS dam projects and the district court grants such relief, the agencies retain the option to appeal to this Court.

V

After a careful review of the record, we affirm the judgment of the district court. It did not abuse its discretion in granting injunctive relief to plaintiffs. We dismiss intervenor-defendants' appeal of the district court's NEPA disclosure order.

**AFFIRMED in part, DISMISSED in part.**