**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| PUYALLUP TRIBE OF INDIANS,<br><br>         Plaintiff - Appellee,<br><br>  v.<br><br>ELECTRON HYDRO LLC; THOM A. FISCHER,<br><br>         Defendants - Appellants,<br><br>and<br><br>TOLLHOUSE ENERGY COMPANY,<br><br>         Defendant. | No. 24-954<br><br>D.C. No.<br>2:20-cv-01864-JCC<br><br>MEMORANDUM* |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Senior District Judge, Presiding

Argued and Submitted July 11, 2024
Seattle, Washington

Before: HAWKINS, McKEOWN, and BRESS, Circuit Judges.
Dissent by Judge BRESS.

---

   *   This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Electron Hydro and its CEO, Thom Fischer, (collectively, "Electron") appeal a district court order granting partial summary judgment in favor of the Puyallup Tribe of Indians ("Tribe") on its claim that Electron's temporary spillway on the Puyallup River causes a "take" of threatened fish species under the Endangered Species Act ("ESA"). *See* 16 U.S.C. § 1538(a)(1)(B). The threatened fish species at issue are Chinook salmon, steelhead trout, and bull trout. Electron also appeals the permanent injunction the district court issued requiring it to remove the center portion of the spillway. Because the parties are familiar with the facts, we do not recount them here. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), and we affirm.

We review de novo the district court's grant of partial summary judgment. *See 2-Bar Ranch Ltd. P'ship v. U.S. Forest Serv.*, 996 F.3d 984, 990 (9th Cir. 2021). And we "may affirm the district court's judgment on any ground finding support in the record." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). For an injunction, we utilize an abuse-of-discretion standard and review any underlying factual findings for clear error. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Viewing the evidence in the light most favorable to

the nonmovant, we must "determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021) (internal quotation marks and citation omitted).

To begin, the district court properly applied the relevant substantive law for "take" under Section 9 of the ESA. The district court's order set out the correct standards for "take" as well as the "harm" and "harassment" needed to find "take," quoting the relevant statutory provision and agency regulations. *See* 16 U.S.C. § 1532(19); 50 C.F.R. §§ 17.3, 222.102. Contrary to Electron's argument that the district court excised the "significance" requirement found in the "harm" and "harassment" regulations, the district court's order is replete with references to the record explicitly stating that the spillway significantly impacted the fish's ability to migrate and spawn. Further, the court adhered to our precedent, which holds that a "significant habitat modification" that "significantly impair[s] essential behavioral patterns" qualifies as "actual injury" under the ESA. *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996) (quoting 50 C.F.R. §§ 17.3).

Electron also endeavored to turn this appeal into a battle over facts, but our review of the record reveals that are no genuine disputes of material fact that would preclude a "take" conclusion as a matter of law. Electron does not dispute that the dominant flow of the Puyallup River is currently over the temporary

spillway, creating "false attraction flows" that attract migrating fish to the spillway and away from the fish ladder. Electron's expert, Dr. Barrett, even admitted that it was "more challenging" for fish to find the fish ladder, given the current flow of the river, and that fish may only be able to ascend the spillway itself "at some flow levels."

Electron points to the fish ladder as a mediating factor for any harm caused by the spillway, but it does not dispute that the fish ladder is cut off from the river at times, including during Chinook migration season. Electron's proffered evidence regarding the effectiveness of the fish ladder—one observation report from October 2023 and one photo out of over 5,000 taken during that month that indicate that fish were using the ladder—is not more than the "scintilla of evidence" needed to establish a genuine issue of material fact. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

Additionally, the lack of any evidence of dead or injured fish around the spillway does not defeat a grant of summary judgment. Such evidence is not required to establish "take" under the regulations or our case law. *See* 50 C.F.R. §§ 17.3; *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1156–58 (9th Cir. 2024); *Marbled Murrelet*, 83 F.3d at 1064.

The district court did not abuse its discretion in fashioning the injunction requiring Electron to remove the center portion of the spillway. The record

supports the district court's determination that Electron's proposed alternatives had significant drawbacks and that the fish ladder would not be a reliable alternative for effective fish passage. In contrast, altering the spillway to ensure fish passage is a lasting remedy "tailored to remedying the specific harm[s] alleged"—both the "false attraction flows" and the impediments to upstream migration created by the current configuration of the temporary spillway. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024).[1]

Finally, because both the grant of partial summary judgment and the scope of the injunction were appropriate, we deny Electron's motion to stay the injunction, Dkt. #8, as moot.

**AFFIRMED.**

---

[1] We grant the Tribe's motion for judicial notice, Dkt. #29, of the district court's stipulated order of April 26, 2024, that modified the challenged injunction. *See Bryant v. Carleson*, 444 F.2d 353, 357 (9th Cir. 1971) (stating that a court may "take judicial notice . . . of developments since the taking of this appeal, called to our attention by the parties, since such circumstances may affect our consideration of the various issues presented.").

*Puyallup Tribe of Indians v. Electron Hydro LLC, et al.*, 24-953

FILED

AUG 16 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BRESS, Circuit Judge, dissenting.

As the majority explains, it is undisputed that the spillway is creating "false attraction flows" that attract migrating fish to the structure and away from the fish ladder. But this is not sufficient to indicate the absence of a genuine dispute about whether the structure *significantly* affects fish migration, spawning, or other behavior, which is the required legal inquiry. *See* 50 C.F.R. §§ 17.3, 222.102. And I think that point is genuinely disputed, so summary judgment should have been denied.

First, although Dr. Barrett observed only one of the ESA-listed fish at issue here on the fish ladder on October 5, 2023, other salmonoid fish were also observed using the ladder on that same occasion (and on others), and Dr. Barrett cited poor visibility as a reason for not observing more fish. Dr. Barrett also relied on historical trap and haul data from January 2017 to July 2020, indicating that the ladder had previously enabled upstream fish migration. As Dr. Barrett reported, the fish ladder "has provided conditions suitable for fish passage during all but a dozen or so inspections" made during his "2.5+ years of [his] involvement with the fish ladder." And he further opined, with support from historical data, that winter storms may have inhibited steelhead climbing the fish ladder, and that the decline in steelhead may be attributable to other causes.

1

Second, although the Tribe focuses on the undisputed fact of the attraction flows, there is a genuine dispute as to the effect of these flows on fish. Dr. Barrett maintained that even if fish were attracted to the spillway, they would not be "doomed to stay there until they are dead, injured, or exhausted." Rather, they could ascend the fish ladder or the temporary rock spillway itself. This opinion was supported by Dr. Barrett's description of the river conditions and his explanation that fish initially attracted to the spillway will find the fish ladder. Dr. Barrett further observed that the "challenges" the spillway creates for upstream migration are naturally present in "thousands of mountain streams and rivers in the Pacific Northwest" and are "part of the waters that salmonid fishes evolved in, that they are adapted for, that they are successful in overcoming."

Finally, while not dispositive, Dr. Barrett's testimony about the absence of dead fish contributes to the genuine dispute of material fact. Dr. Barrett found no fish carcasses during his survey of areas where he believed dying or injured fish would accumulate. The district court described the Tribe's competing explanation as "unrebutted," but I do not think that is the case. Although the Tribe was not required to show fish are dying to prevail, the lack of dead fish is at least relevant to whether the structure is killing, injuring, or significantly impairing fish migration.

In my view, although the district court applied the correct legal standard, the evidence considered as a whole creates a genuine dispute about whether the spillway

2

is significantly impeding fish migration, breeding, or other essential behaviors.  I

thus respectfully dissent.